11  223
28  139

## JERRY HOLMES *v.* THE STATE.

1. MURDER.— MALICE is an essential constituent of murder either of the first or the second degree. The homicidal act must not only be unlawful, but the slayer must be actuated by malice; and whether he was so actuated involves the pivotal issue in murder trials wherein the contest is between murder on the one side and manslaughter, or justifiable, excusable, or negligent homicide on the other. Without malice there can be no murder.
2. SAME — CHARGE OF THE COURT.— It follows that, if the charge to the jury in a trial for murder fails to define or explain the element of malice, it fails to present the "law applicable to the case," as required by the Code.
3. SAME — PRACTICE IN THE COURT OF APPEALS.— If, as in the present case, the appellant was convicted of murder in the court below, and the record on appeal shows that no definition or exposition of the term malice was given in charge to the jury, this court is authorized to set aside the conviction on that account, notwithstanding the appellant failed to ask a proper instruction in the court below, but raised the question in his motion for a new trial.
4. MANSLAUGHTER.— See a state of proof in a trial for murder which required the law of manslaughter to be given in charge to the jury.
5. EVIDENCE.— In a trial for murder it was legitimate for the State to prove that the deceased, when killed, was under the influence of intoxicating liquor.

APPEAL from the District Court of Atascosa. Tried below before the Hon. G. H. NOONAN.

The indictment was presented in November, 1879, and charged that the appellant, on the 29th of the preceding January, did willfully, feloniously, and of his malice

aforethought kill and murder one Barney Sherran. The case came to trial in May, 1881, and the trial resulted in the conviction of appellant for murder in the second degree, and an assessment of five years in the penitentiary as his punishment. A considerable number of witnesses were examined at the trial, and their testimony comprises a large part of the record. There was no controversy over the fact that Sherran, the deceased, came to his death in consequence of gun-shot wounds inflicted by the appellant about dusk in the evening of the day alleged in the indictment, and in front of a saloon kept by the appellant in the town of Pleasanton, Atascosa county.

C. J. Emsley was the first and principal witness for the State. He testified that he and the deceased were sitting on a bench upon the gallery in front of appellant's saloon, and the appellant was sitting on his door-step, in front and a little to the right of the deceased, when Dick Marshall walked up behind the deceased and in talking to him said, "Give me that pistol of yours, Barney, and let me put it away for you." Several persons were present, but at this time they all walked away, leaving the deceased, the witness, and the defendant by themselves. When Marshall asked for the pistol it was in its scabbard belted around the deceased, who then took it out of the scabbard and placed it across his lap, but with the muzzle pointed in a different direction than the defendant's position. Then the deceased looked at the defendant and said, ": Jerry, you have acted the G—d d—n —— —— with me." Defendant said "Barney, go off and attend to your business; I don't want to talk to you." Deceased got up from his seat, with his pistol in his hands. Witness reached for the pistol, and said "Barney, behave yourself," and at this time the deceased's pistol was discharged in a direction opposite from the defendant, the ball entering the floor of the gallery. The defendant then got up and said, as well as the witness could remem-

ber, "I will settle this affair d—n quick," and went to the rear end of the saloon, a distance the witness supposed to be forty-five or fifty feet. While defendant was passing back in the saloon the deceased stepped off the south end of the gallery and turned north, outside the gallery, and along the street. He went about as far as the corner post at the north end of the gallery with his face turned towards the north and his left side to the saloon as he walked off. When deceased reached the north end of the gallery, the defendant was inside the front door of the saloon. Several shots were fired in rapid succession. Two shots were fired out of the saloon door from a double-barreled shot-gun, two were fired from the street, and three from the saloon besides those from the shot-gun. The deceased fired the two shots from the street. The first shots, after the accidental one before the deceased got off the gallery, were those fired out of the saloon from a double-barreled shot-gun. Deceased was shot in the left side of his back, and the ball lodging in his right side. He fired and walked a step or two before he fell and after he was shot. Witness assisted in taking care of the deceased, who died the next morning after he was shot. Defendant did not come outside of his door.

This witness Emsley appears to have been subjected to a searching cross-examination. He stated that "the killing occurred late in the evening; it was after dark or sun-down; it was night. I was sitting so I could have seen the lights in the house. It was between sun-down and dark at the time of the shooting; if twilight had not expired, it was about expiring. During the time the shooting was going on, it was between sun-down and dark or dusk of the evening. The lights might have been burning in Holmes's saloon, but I don't know whether they were or not." The witness said he did not remember what he swore at the coroner's inquest about

the lights in the saloon, or whether he testified that it was dark; but what he said before the coroner was correct. He was "liable to get drunk and forget many things that occur." When the shooting began, he stepped off the south end of the gallery, to get out of the way. He was close to the fence, and may have been hugging it. During the day he and the deceased took three or four drinks together at one saloon and two or three at another, but none at the defendant's. Witness supposed that the deceased, when he vilified the defendant, had his pistol in his lap. No one handled it but the deceased, and it was cocked when it fired on the gallery, but witness could not say whether or not the deceased cocked it when he laid it in his lap. When he brought it round to his lap he said "Jerry, you know I have the best of you." Witness did not see the shot-gun. He did not know that the deceased went to defendant's saloon for the purpose of raising a row, but may have heard him talk hard of the defendant at one of the saloons.

Re-examined by the State, the witness said it was light enough for him to see both the defendant and deceased distinctly. It was only supposition on his part that the first shots after the accidental one on the gallery were fired by the defendant, and also his supposition, based on their sound, that they were fired from a shot-gun. He did not see the deceased point his pistol at the defendant before the latter went into the house.

W. N. Smith, for the State, testified that about dark in the evening of the homicide he was sitting in front of his own saloon and with his back to defendant's, which was forty or fifty feet distant, when J. W. Murphey, H. W. Chapman and C. C. Campbell came from the direction of the defendant's and apprised witness that there would be a row in a few minutes. Campbell passed on some forty feet beyond witness's saloon, into which the other two and the witness entered, and just then there was a report

which witness thought was that of a pistol. Just after that report came two others which he took to be from a shot-gun. After the firing, the witness returned to his door and saw the deceased fall.

On cross-examination the witness said that he knew it was Sherran who fell when he went to him; it was not light enough for him to identify the person from his saloon. Witness also stated on the cross-examination that he was still outside his saloon when he heard the first report, but was inside when he heard the others, though there was a very short time between them. The reports which followed the two which he thought were from a shot-gun he took to be pistol shots; there were three, four or five of them, and they sounded like they were fired outside the defendant's saloon. All the reports were very loud.

J. E. Petty, for the State, was a deputy sheriff and heard the shooting. He saw the deceased lying down, but went into the saloon of defendant and arrested him, and then returned to the street and helped to undress the deceased, whose coat he exhibited to the jury, showing in it a hole about six inches above the left hip, supposed to have been made by a bullet. The wound of the deceased, which was on the left side of his back, was probed by a doctor, who cut out a bullet as large as a six-shooter ball from its lodgment against the skin on the opposite side. The two reports next after the first one were louder than the others.

On cross-examination the witness stated that after the dressing of deceased's wound, Emsley pointed out to witness the spot where the deceased stood, saying "here is where Barney stood, and the first shot was fired from this corner;" which shot, the witness added, was in range of a shot which struck the door-facing of the defendant's saloon.

Willie O'Brion, for the State, gave a vivid sketch of his

observations.  Prior to the shooting he went to the defendant's saloon, and there saw the deceased, drunk.  The defendant, speaking to the deceased who was bothering him, said "Hush! don't speak to me, d—n you;" and then the deceased replied "Don't d—n me; I have the advantage of you."  Witness then knew and said to Dick Marshall that there was going to be a row, and went to Dick Marshall's store.  "Then," said the witness, "I heard shots fired; I saw a blaze of fire; I don't know what they were fired from,—there was a constant blaze between the door and the post,—nor who fired them.  The blaze of fire was near the door of Holmes's saloon; the blaze looked like it was between the north post of the gallery and the door, and then there was one continued blaze.  It was dark, and I could not see Barney Sherran from where I stood.  I can't say how many shots were fired.  I do not know whether they all sounded alike or not."

On his cross-examination the witness stated that he saw the deceased put his hand to his back before the firing commenced, and heard him say "don't curse me, I have got the best of you."

W. V. L. Marshall, for the State, testified that as he passed the defendant's saloon he saw the deceased and several others there.  The saloon was lighted up.  Witness walked up to the deceased and laid his hand on him, and in doing so touched his pistol.  Deceased gave witness a look as much as to say don't bother my pistol, and witness went off and did not bother him.  Witness had long been acquainted with the deceased, and had never before seen him have a pistol, and tried to get the deceased to let him put it away for him through the day, but deceased would not do it.  It was dark, and all the houses, as well as defendant's saloon, were lighted up.  With this witness the State closed its evidence in chief.

C. C. Campbell, for the defense, stated that he was pres-

ent in front of defendant's saloon when the altercation commenced between the deceased and the defendant, with an aggravating remark by the deceased. Marshall came up and appeared to be trying to get the deceased's pistol, who drew and placed it across his lap, and cocked it as he did so. Witness went away, not wanting to see the difficulty, but after passing Smith's saloon he stopped and there heard what he took to be the report of the pistol. Witness turned and looked, and through a window in the defendant's saloon saw a person whom he took to be the defendant run back into the saloon and instantly return. A shot was fired from the outside into the saloon door, towards where the defendant was standing, and then a shot was immediately fired from the inside of the saloon. Witness thought this latter shot was from a shot-gun, and it appeared from the blaze to have fired in the air at an angle of about forty-five degrees. Within ten seconds a pistol shot followed from the outside, and then from the inside came other shots, which appeared to be shot wild by some one under excitement. Witness was positive that the first shot was from the outside,—that is, the first shot after the accidental one,— and it appeared to be nearly in front but a little north of the saloon door, or about the northeast corner post. A man on the outside could have seen another inside the saloon better than the latter could have seen the former. The saloon was lighted up. Before witness left the saloon he heard the click of the deceased's pistol as he cocked it. While the shooting was going on the witness remarked "Jerry is shooting wild." The witness verified and explained a diagram of the saloon and its surroundings.

On his cross-examination by the State the witness stated that the day after the difficulty he saw in the roof of the gallery what he took to be a load of shot, which, as the context shows, he ascribed to the first shot fired by the defendant, at a rising angle of about forty-five degrees.

Deceased did not seem angry when he laid the pistol in his lap, cocked, but immediately said, "D—n you, Jerry, I have the best of you," and then he did seem to be angry. This remark, according to the witness, was made after the defendant had told the deceased to go away and not bother him.

The defense introduced the deposition of the State's witness Emsley before the coroner's inquest. It was less definite and circumstantial than his testimony at the trial, and there are some discrepancies between the two, but, as they seem irrelevant to the rulings of this court, and as the witness himself gave the preference to his deposition at the inquest, there is no necessity to reproduce it here.

W. T. Marr, for the defense, testified that he was positive that the second shot was from a pistol and was fired into the saloon from the outside. He saw the man who fired it, and saw the flash of the pistol, and could distinguish between the report of a pistol and that of a shotgun.

J. H. Dossey, for the defense, testified that the deceased, a short time before he was killed, was at work about two miles in the country, and said that the next time he went to town he intended to have a six-shooter, and he would show Jerry Holmes that he could use it if he was an Irishman.

Cross-examined, the witness stated that he never communicated the threat to the defendant before the killing. Over objection by the defense, the witness testified that before the threat was made, the deceased had tumbled into the defendant's bed with his clothes and boots on, and defendant said he did not want any d—d man sleeping in his bed, and made the deceased get up and go out of the room, pushing him towards the door.

Mrs. Winn, for the defense, testified that she was standing in her door and saw the flash of the fire-arms

between the deceased and the defendant. The first two shots were fired from outside the saloon, and seemed to her to be fired into it. She was positive they were fired from the same weapon, from the sound of the reports.

G. W. M. Duck, the sheriff of the county, testifying for the defense, stated that in a conversation with the State's witness Emsley, either the night of the diffiulty or the next morning, Emsley told him that the first shot was fired from behind the northeast corner post of the gallery of the defendant's saloon.

The defense having closed its evidence, the State recalled Emsley, who testified that he had no remembrance of telling Duck and Petty that the first shot was fired from the gallery post; but if he did so state he meant that the first shot fired by the deceased, after the accidental one, was fired from the post, and did not mean that that shot was the first one fired after the accidental one.

The evidence has here been much abbreviated by the omission of repetitions, explanatory statements, and collateral details. Many objections were interposed by the defense to different features of it, and also to matters of practice in the course of the trial,— which, it is obvious, was contested with vigor and ability on both sides. This cause was affirmed at the Austin term, 1881, but without a reportable opinion. A motion for rehearing was filed, and the cause transferred to Tyler.

*D. P. Marr*, for the appellant. The third assignment relates to the admission of evidence as to the drinking or drunkenness of deceased upon the day of the killing, over defendant's objection. It is not perceived how this testimony, in view of the other testimony upon the trial, was at all relevant or competent.

" Evidence in legal acceptation includes all the means by which an alleged matter of fact, the truth of which is submitted to investigation, is established or disproved."

"By competent evidence is meant that which the *very nature of the thing to be proved* requires as the fit and appropriate proof in the particular case."

"Relevant, relieving, lending aid or support, pertinent or applicable, sufficient to support the cause." (Webster.)

Relevancy — "By this term is understood the evidence which is applicable to the issue joined; it is relevant when it is applicable to the issue, and ought to be admitted; it is irrelevant when it does not apply, and it ought then to be excluded." (Bouvier.)

Now, what was then to be proved, the issue joined? Verily, the guilt of defendant of some degree of murder. The issue was guilty or not guilty. How did the drinking of deceased on the fatal day affect the matter, or how did this fact tend to prove, or even disprove, the main fact? I am unable to say. The state of mind of deceased was not the subject of inquiry or legitimately put in issue by the prosecution. He was not charged with murder. If he had been, then it might have been both proper and important to ascertain of which degree he was guilty, and to this end evidence of drunkenness would probably have been competent. In the present case such evidence did not prove or tend to prove any fact legitimately put in issue. It was not *criteria* from which the jury could legitimately infer the guilt or innocence of defendant. It was purely (in view of the fact that defendant was a liquor dealer) a matter of aggravation, well calculated to arouse the wrath and indignation of the jury. Possibly, had the State laid a proper predicate by showing that deceased was prostrate or imbecile so that he was physically unable to fight or maintain an attack, it might then have been admissible to prove what placed him in such condition, solely, however, for the purpose of repelling the idea of self-defense; but this would have been more appropriate after defendant had closed, and by way of rebuttal, if at all. The fact that such course was not pursued by

the State evinces indubitably that such was not the purpose for which it was offered. *It was introduced as a matter of aggravation to arouse the indignation of the jury.* In the light, therefore, of the whole record the court committed a grave error in admitting this evidence. After the ruling of the court below, defendant attempted to break the force of it by showing that he did not sell deceased any of the liquor he may have drunk; hence some of this testimony appears to have been drawn out by defendant. I submit, however, that defendant did not and could not break or dissipate the detrimental effect of this evidence upon the jury. Possibly he may have excluded the presumption of his complicity in producing the drunkenness, but not the fact of its existence. Such testimony was not a part of the *res gestœ* as appears from the legal definition of the term. (Bouvier's Law Dic., "Res Gestæ," and 1 Greenl. Ev. sec. 108.) The admission of irrelevant testimony over proper objection is a sufficient ground for a new trial *(State* v. *Mikle,* 81 N. C. 552), and this court has repeatedly so held. *(Cox et al.* v. *State,* 8 Texas Ct. App. 304, approving *Williams* v. *State,* 43 Texas, 116.)

I now come to the consideration of the supposed errors of omission and commission in the charge given by the court. In the motion for a new trial the attention of the lower court was directly called to the errors in the charge. That in a felony it is the duty of the court to charge all the law applicable to the case and every phase thereof under the evidence, whether requested or not, and if the error or omission is fundamental, material or essential to a proper understanding of the offense charged, or is calculated to injure or prejudice any of the rights of the accused, judgment will be reversed, whether the charge was excepted to or not, is no longer an open question. *(Henry* v. *State,* 9 Texas Ct. App. 358, approving, among others, *Bishop* v. *State,* 43 Texas, 390; see also Revised Statutes, art. 1318.)

1. There was no definition of malice at all. Neither its legal meaning or import in common parlance was given, nor was the distinction between the two drawn. Malice is the most essential ingredient in the crime of murder. Without it there can be no murder of either degree. It distinguishes that offense from every other species of culpable homicide. Unless it was explained to the jury they could not understand its legal meaning, or the offense for which they were trying the accused, nor the right of self-defense. Its definition, therefore, was material and important to defendant, and he had a plain statutory right to have the term fully explained to the jury. Possibly had the court defined the term as understood in common parlance, as was done in the case of *Harris* v. *State*, 8 Texas Ct. App. 90, the appellant might not be heard to complain of the omission. But the present case is plainly distinguishable from the Harris case. There the charge of the court contains a full and explicit definition of the term malice, though possibly it limits the meaning to "hatred," "ill will" or "hostility," and this court held such definition was not to the prejudice of the accused. Here, however, there is no definition of the term at all. Surely, therefore, in view of the premises, when this total omission is considered, this court cannot hold that the charge in question contains all the law applicable to the case. (Code Crim. Proc. art. 677.) But I regard the law on this point affirmatively settled by the repeated decisions of this court, even in less important cases than the present. 3 Texas Ct. App. 472; Id. 318; *Smith* v. *State*, 1 Texas Ct. App. 516; *Anderson* v. *State*, 1 Texas Ct. App. 730; 1 Texas Ct. App. 397.

"Malice," says Bouvier, "is a wicked intention to do an injury," and this intention is not confined to the persons injured. It may be directed to some one else or against mankind in general. But I find this term explained to my satisfaction in the opinion delivered by Mr.

Justice Clarke in *Harris* v. *State*, *supra*, wherein it is said: "Malice is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken."

2. In view of the facts developed in evidence, it was the duty of the court below to have charged the law of manslaughter to the jury, and the omission to do so, having thereby excluded this issue from the jury, is an error sufficiently prejudicial to appellant to require a reversal of the judgment. This court, as well as the Supreme Court, has uniformly held that where there is any evidence, however slight, tending to justify the act or reduce or ameliorate the grade of the offense, the accused is entitled to the benefits of it under appropriate instructions from the trial court, submitting the question to the determination of the jury. *Richardson* v. *State*, 9 Texas Ct. App. 612; Id. 95; *Wasson* v. *State*, 3 Texas Ct. App. 474, and authorities cited; 38 Texas, 485; 7 Texas Ct. App. 414.

Was there any such evidence from which the jury might probably have inferred in the case at bar that the killing was done " under the immediate influence of sudden passion arising from an adequate cause?" I answer that there was not only such evidence, but abundantly sufficient evidence. To verify this let the statement of facts be examined, and particularly the testimony of State's witness Emsley and defendant's witness Campbell. From this testimony in particular I deduce the following conclusions of fact as bearing upon the point under investigation: First, just prior to the fatal shot, deceased had attempted to make or had made a violent and unlawful attack upon the appellant; had cursed appellant, drawn his pistol, and told appellant that he (deceased) had the best or advantage of defendant. Second, at this time, while deceased was in the dark or shadow of the roof of the saloon gallery, and defendant in the

light, sitting in his door, deceased either shot off his pistol in an attempt to kill defendant or it was accidently discharged in the scuffle with Emsley, who it seems was trying to wrest the weapon from deceased and stop his attack. Third, that defendant thereupon (when under great *disadvantage as to weapons, light and position)* rushed hastily into the saloon. Fourth, that he returned in a very short time (armed in all probability), Campbell swearing "almost instantly," and no witness fixed the time at longer than 10 or 15 seconds. Fifth, that upon such return firing between the parties was immediately renewed and continued upon both sides until deceased was killed by the seventh or eighth shot; but the evidence is conflicting, and there is a grave and reasonable doubt as to who fired the first shot after the difficulty was renewed or continued, with strong probabilities, however, that deceased renewed the attack upon defendant's return to the doorway. Sixth, defendant was enraged and excited, and justly so under the circumstances; and, as the witness Campbell testified, "shot wild."

In view, therefore, of the premises I submit that the law of manslaughter should have been given to the jury. The learned judge who presided below was evidently of the opinion that the "adequate causes" enumerated in the Code are exclusive. Unquestionably he was in error. The rule *expressio unius, exclusio alterius est* has no application to this subject. *Reed* v. *State,* 9 Texas Ct. App. 317; 2 Texas Ct. App. 476; 38 Texas, 485.

*H. Chilton,* Assistant Attorney General, for the State.

HURT, J. The appellant was convicted of murder in the second degree. "Every person with a sound memory and discretion who shall unlawfully kill any reasonable creature in being within this State, with malice aforethought, either express or implied, shall be deemed guilty

of murder." To constitute this offense without regard to degrees, the killing must not only be unlawful, but the slayer must be incited to kill by *malice*. Malice is, therefore, an essential element, and must prompt the slayer to the act of killing in every case, whether of the first or second degree.

Is a charge which fails,—in fact, does not attempt,—to define or explain malice such an one as is required by the law? This explanation or definition being omitted, does the charge present the law applicable to the case? It being absolutely a necessary ingredient of this offense, a clear understanding of the term "malice," by the jury, was of vital importance to the proper decision of the main question, to wit: was the defendant guilty of murder? Its existence forms the pivotal point in all murder trials in which the contest is between murder on the one side and manslaughter, justifiable, negligent or excusable homicide on the other. Without it there can be no murder. We are of the opinion, therefore, that a charge which fails to explain this element does not present the law applicable to the case. This defect in the charge was pointedly called to the attention of the court by the motion for a new trial herein. *Bishop* v. *State*, 43 Texas, 390.

We are authorized to revise the action of the court below, though a proper charge was not requested at the time by the defendant. These authorities, we think, place at rest the question above presented: *Hodges* v. *State*, 3 Texas Ct. App. 470; *Anderson* v. *State*, 1 Texas Ct. App. 730; *Smith* v. *State*, 1 Texas Ct. App. 517; *Williams et al.* v. *State*, 3 Texas Ct. App. 316.

We are also of the opinion that the case as made by the facts is such as required a charge upon manslaughter. (The Reporter will give the evidence.)

The State, we think, clearly had the right to prove that deceased was under the influence of whisky. The other errors complained of by the attorney for defendant will

not likely arise again upon another trial.   The motion for rehearing is granted, and upon the merits the judgment, for the reasons stated above, is reversed and the cause remanded.

*Reversed and remanded.*